ALLEN, Collector of Internal Revenue,
v. BEAZLEY.
No. 11572.

Circuit Court of Appeals, Fifth Circuit.

Nov. 14, 1946.

Newton K. Fox, Helen R. Carloss, and Mills Kitchin, Sp. Assts. to the Atty. Gen., and Sewall Key, Acting Asst. Atty. Gen., all of Washington, D. C., and John P. Cowart, U. S. Atty., of Macon, Ga., for appellant.

John A. Sibley and James A. Branch, Jr., both of Atlanta, Ga., for appellee.

Before HOLMES, WALLER, and LEE, Circuit Judges.

WALLER, Circuit Judge.

The Court below aptly stated the issues in this case as follows:

"The question presented is whether plaintiff was taxable on the interest on certain securities purchased and pledged to secure a loan in his own name, or whether this income was taxable equally to him, his wife and his son. The answer to the question is controlled by whether he singly or they jointly owned certain bonds, stocks and note of the Southern Ice Company, Inc., of Dallas, Texas, and of certain stocks of affiliated ice companies. Plaintiff claims they were bought and pledged pursuant to the terms of a family arrangement made in 1939 in which the plaintiff was authorized in writing to purchase the securities for the three in actual shares and to finance the

acquisition through a pledge thereof, in his own name alone, which arrangement was undisclosed until 1941 for reasons which will be discussed."

This is not the case of a family partnership, but it is a joint purchase by the taxpayer [the father], his wife, and son, of certain corporate securities, carrying with them the voting control in Southern Ice Company, Inc., and other kindred and affiliated concerns. The purchase price for the stock and underlying securities was $1,000,-000, payable $750,000 cash, with the balance in one, two, and three years, secured by a second mortgage on the securities so acquired. All of the negotiations for the purchase of the securities were conducted by the father, who for a number of years had been a well-known and successful executive in the ice manufacturing business. In the process of acquiring the securities the father arranged to borrow the cash payment of $750,000 from First National Bank of Dallas, Texas, which sum was secured by a first mortgage on the assets purchased, and which indebtedness was evidenced by promissory notes, negotiable in form but not under seal, signed only by the taxpayer.

The contract for the sale and purchase of the securities and the concomitant loan was executed by the seller, the taxpayer, and the bank, and will be referred to as the "tri-party contract". This agreement contained the stipulations that:

"Purchaser hereby covenants with and warrants unto Bank that Purchaser is the legal and equitable owner of the securities. * * *

"* * * Purchaser agrees that he will not, without the written consent of the Bank, so long as any of the indebtedness to the Bank shall remain unpaid, nor without the written consent of the General Finance (the seller) so long as any of the indebtedness to General Finance shall remain unpaid, sell, transfer, assign or otherwise dispose of the securities or any part thereof."

Notwithstanding the foregoing stipulation, the uncontradicted evidence shows that a few days after the agreement for the purchase of the securities had been tentatively agreed upon, but before the tri-party agreement was executed and the securities purchased, the taxpayer, his wife, and son, after consultation with an attorney and a tax consultant, agreed to purchase the securities jointly, and on April 21, 1939, the agreement between the father, mother, and son was reduced to writing and duly executed, under seal.

This agreement provided that the taxpayer, his wife, and son agreed to buy securities in accordance with the terms of the tri-party contract already tentatively agreed upon between the taxpayer, the owner of the securities, and the Dallas Bank. Each of the three was to have one-third interest in the securities and each was to become liable for one-third of the purchase price. The agreement stated that "for reasons of practical convenience" all negotiations and dealings with the owners of the securities and with the lending bank were to be conducted by the taxpayer alone, he being constituted an attorney in fact for such purpose. The agreement provided that securities were to be purchased, the bank loan to be made, and the notes to the bank and the seller to be signed, in his name alone, and that no disclosure of the interest of the wife and son was to be made to the bank and seller unless the bank or the seller might exhaust the collateral put up to secure payment and a deficiency result which the taxpayer would be called upon to satisfy. Upon the happening of this contingency the joint liability of the wife and son would be revealed. The taxpayer was to be reimbursed proportionately by each for all sums that he should be called upon to pay out of his own individual resources and for all expenses. He was required to account to his wife and son for all receipts and disbursements.

It was also agreed that the income from the securities would go to liquidate the indebtedness and be credited upon the purchase money notes which the taxpayer had executed, until such time as same were fully paid.

The taxpayer gave two reasons why the purchasing and financing were carried through in his name instead of in the name of himself, his wife, and son; first, that it was simpler and more convenient, and

secondly, that he was informed by a Texas attorney that the deal might be jeopardized on account of the community property laws of Texas in the event the wife's connection with the purchase were made known to the seller or to the bank.

There was no concealment of the facts from the taxing authorities, for the taxpayer, his wife, and son each reported one-third of the income from the securities in every return made after the securities were purchased. Books of account were promptly opened and kept, showing the joint purchase, the expenses incurred, the income produced, and to whom it was distributed. State intangible and other tax returns showed the divided ownership from the beginning, and all these records were made accessible to the Government when the tax returns were audited.

As stated at the outset, the taxpayer was well known in the ice manufacturing business. His annual salary at the time of the purchase was $40,000. The wife owned property valued at approximately $30,000, and the son's property was valued at $6,000.

For a number of years the son had worked for his father's ice concerns in many capacities, beginning at the lowest and undertaking to work up. After a number of years he and his mother felt that being the President's son was a handicap to him in his work, and there had been numerous discussions prior to the purchase of these securities in which the son and mother urged the father to establish the son in business by purchasing a sufficient interest in some company of which the father was not a managing executive and in which the son could be appropriately placed, so that he could demonstrate his own ability and go forward without the retarding effect of being in the shadow of his father's more commanding figure as an ice manufacturing executive. It was with this purpose in mind that the taxpayer and the family became interested in the purchase, and decided upon the purchase, of the securities in the Southern Ice Company. The son was twenty-six years old, married, and possessed of his father's ambitions and much of his capacity. When the purchase was completed, the son promptly moved to Texas and as-

sumed an important position in the management of the Southern Ice Company's affairs, from which position he has steadily moved upward and forward and is now a director, Vice President, and general manager. This concern, before the acquisition of the stock by the Beazley family, was a losing venture, but from thenceforth it became a highly successful company, due in part to change in management and operative methods.

The obligations incurred in the purchase of the stock were paid in due course. Neither the seller, nor the bank, nor any creditor was in any wise injured by the failure of the taxpayer to reveal to the seller and to the bank the fact that the other two members of his family were joint purchasers of the securities.

These facts were found by the lower Court to be true and are, in the main, set out in the statement by the appellee as being the facts in the case. Not only are the facts as found by the lower Court supported by substantial evidence, but they are, in fact, uncontradicted. Counsel for the Collector insists, however, that the notes to the bank and to the seller of the securities were, on their face, the sole obligation of the taxpayer, and so regarded by the bank and the seller, and that the dividends from the securities so purchased were used to pay and discharge those notes of the taxpayer, and that since the taxpayer thus got the benefit of the income from the securities in the payment of his indebtedness, he should be charged with the income tax so derived and applied.

On the other hand, the appellee insists that the father went into the deal with his wife and son in order to help his son and not for the purpose of evading taxes; that the son is now a managing executive in the operation of the business and has been ever since its acquisition, which is the business for which the son was trained in his father's enterprises; that every term of the family contract was carried out; that ownership by each of the three was recognized and asserted from the beginning; that books of account were immediately opened up and properly kept; that there was no concealment of the joint ownership of

the stock from the Internal Revenue Department; that Beazley, Sr., was authorized to act, and acted, as attorney and trustee for the wife and son; that the income tax consequences of the transaction must be determined by the realities of the situation as abundantly proven to, and correctly found by, the lower Court, rather than upon the suspicions with which the taxing authorities are accustomed to view family business partnerships; that the failure to disclose to the bank and the seller of the securities the family connection with the transaction is insufficient to overcome the undisputed evidence as to the actuality and bona fides of the family agreement.

Taxpayer paid the taxes demanded of him and sued the Collector of Internal Revenue of the State of Georgia for a refund of those taxes. The lower Court, finding that there was a bona fide contract between the members of the family which was in no wise entered into for the purpose of tax evasion but for the chief purpose of providing an opening for the son in his chosen business career, rendered judgment for the taxpayer.

▮ We think that the findings of fact by the Court below were not only supported by substantial evidence but are uncontroverted.

We are aware of the suspicion with which the taxing authorities and the Courts view family partnerships and arrangements which have the effect of dividing the family income among the members of that family. We are also fully cognizant of the salutary principles so frequently announced that the courts are interested in who has command over the income and for whose benefit it is applied rather than the legal niceties of the title and ownership.[1]

We know, also, that the taxing authorities may—and we think that they should—look at the actualities, the substance, the realities, and not the form of the transaction, in determining such tax liabilities.

▮ There can be no question that if the arrangement between the taxpayer, his wife, and son were a smoke screen to escape income tax liabilities, or if it were an arrangement whereby the head of the family would have unfettered command and control, or the complete use and benefit, of the income, or if the agreement between the family conferred upon him the unhampered discretion to use the income as he saw fit, such head of the family should be charged with the tax upon such income. It was found by the lower Court and demonstrated by the uncontradicted evidence that there is no such arrangement here. The agreement between members of the family was real, actual, and bona fide. The income from the securities was used for the purposes of carrying out the arrangement between the members of the family and for their benefit in paying for the securities which they had acquired. The agreement being actual and bona fide, and the income having been distributed thereunder for the equal and direct benefit of all three members of the family, the taxes on such income should be divided among them.

It is the actuality that accompanies such a family arrangement—not the notoriety given it—that is determinative.

We are aware of no law, state or federal, that prevents persons, whether members of the same family or not, from constituting one of their number as an express trustee to act in his name for and on their behalf in the acquisition of property, but on the contrary we are well aware of the universal rule that where one while acting in behalf of another acquires property in his own name, a constructive or resulting trust in such property so acquired is generally created. We also recall that secret trusts or contracts embracing undisclosed principals are generally ineffectual against bona fide creditors and purchasers for value. But no rights of creditors or third parties here are in any wise jeopardized by the failure of the taxpayer to make known the interest of members of his family in the purchase of securities. The bank and the seller were paid in full. They are not here complaining

---

[1] Harrison v. Schaffner, 312 U.S. 579, 61 S.Ct. 759, 85 L.Ed. 1055; Corliss v. Bowers, 281 U.S. 376, 50 S.Ct. 336, 74 L.Ed. 916; Griffiths v. Commissioner, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319; Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75, 131 A.L.R. 655.

of the failure to reveal the undisclosed principals for whom the taxpayer was acting. The Commissioner of Internal Revenue cannot complain for the reason that the joint purchase of the securities was made known to him from the beginning. We are mindful, too, that family partnerships in an operating business in which some members of the family contribute neither money nor services in the management or operation of the business are often regarded as unreal or spurious in determining the income tax consequences. This, however, is not a family partnership, nor is there any question of operation of the business involved. The sole question is whether there was an actual, bona fide purchase and ownership of the securities by the three members of the family. This has been proven and found by the Court below whose finding is not only supported by the evidence but is without substantial contradiction.

The judgment of the Court below is Affirmed.